# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 11, 2019

## MARK A. CRITES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Williamson County**
No. CR160432  Joseph A. Woodruff, Judge

_____

## No. M2018-02060-CCA-R3-PC

_____

A Williamson County jury convicted the Petitioner, Mark A. Crites, of aggravated robbery, and the trial court sentenced him as a multiple offender to twelve years of incarceration. The Petitioner appealed, and this court affirmed the conviction and sentence. *See State v. Mark A. Crites*, No. M2014-00383-CCA-R3-CD, 2015 WL 3508042 (Tenn. Crim. App., at Nashville, June 4, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015). The Petitioner filed a post-conviction petition, claiming he received the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. The Petitioner appeals the denial, maintaining that his counsel was ineffective. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined. TIMOTHY L. EASTER, J., not participating.

Gary L. Anderson, Knoxville, Tennessee (on appeal) and Jonathan W. Turner, Franklin, Tennessee (at hearing), for the appellant, Mark A. Crites.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Kelly A. Lawrence, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Williamson County grand jury indicted the Petitioner for aggravated robbery. In the Petitioner's first direct appeal, our court summarized the proof presented during the trial.

## A. Trial

This case arose after the [Petitioner] threatened the victim with a hammer and stole his cell phone. The victim and the [Petitioner] resided in the same trailer park. The victim lived on Lot 21, and the [Petitioner] lived across the street on Lot 26. On the morning of the incident, the victim testified that he was in his yard with his friend Jorge. The [Petitioner] entered the yard wielding a red metal hammer. He advanced on the victim, striking the hammer against the road and the yard before swinging it at the victim. He was cursing and shouting at the victim, demanding the victim's money. The [Petitioner] was saying, "M* * * * * * * * *er, I'm going to kill you." The victim did not hear the [Petitioner] say anything about a sexual assault. To the victim, the [Petitioner] appeared as though he had been using drugs.

As the [Petitioner] advanced, the victim began to back away from him. The victim was "very scared," as the [Petitioner] appeared to be "a very desperate person." The victim attempted to mollify the [Petitioner] by offering to give him five dollars. The [Petitioner] refused, instead demanding "everything" that the victim had.

Once the [Petitioner] "let his guard down," the victim was able to run to his truck. The [Petitioner] was standing beside the truck, and the victim did not immediately drive away because he was afraid that he would run over the [Petitioner]. He rolled down the driver's side window in a final effort to talk to the [Petitioner] and to calm him down. He attempted to assuage the [Petitioner's] anger because he feared for his own life and he feared that the [Petitioner] might damage the truck, which had been loaned to the victim. The victim removed his cell phone from his pocket and placed it in his lap. The [Petitioner] raised the hammer above his head, reached into the truck, and grabbed the cell phone from the victim's lap. The victim then drove away from the trailer park and went to a nearby convenience store, where he called 911.

Several police officers from the Franklin City Police Department responded to the call. Officer Nick Grandy arrived at the scene, and he testified that the victim had been identified as "Miguel Lopez." He spoke with the victim, and the victim directed him to a trailer on Lot 26. Officer Grandy entered the trailer, and the [Petitioner] was not present. Officer Grandy saw the [Petitioner's] name on the living room wall, and he found a prescription pill bottle with the [Petitioner's] name and the address for Lot

- 2 -

26. He also saw a "red claw hammer with a black rubber grip" in the kitchen.

Detective Andrew Green also arrived at the scene. He spoke with the victim, who told him that his neighbor had approached him while holding a red hammer, demanded his money, and reached into his truck and stole his cell phone. The victim was not able identify his neighbor by name at the scene, but he provided a detailed description of his neighbor, including his numerous tattoos, to Detective Green. Officers were later able to identify the defendant as the man from the victim's description. At trial, Detective Green identified the victim in the courtroom as the same person that he spoke with on the day of the incident.

Detective Green went to the trailer on Lot 26 and spoke with Officer Gandy. While in the trailer, he too saw a red hammer lying on the kitchen countertop.

The following day, Officer Sam Greer was dispatched to the trailer park after receiving a call regarding the victim's cell phone. He spoke with Pam Sweeny, the [Petitioner's] sister, who gave him a cell phone that she said did not belong to her. She was given the phone by her son, the [Petitioner's] nephew, who told Officer Greer that the phone was located "inside the first trailer on the left" of the trailer park. The [Petitioner's] nephew had retrieved the phone after the [Petitioner] told him of its location. Ms. Sweeny told Officer Greer that the "robbery scenario" reported by the victim was inaccurate and that the [Petitioner] had informed her that the incident involved the [Petitioner's] attempt to confront the men who allegedly sexually assaulted his girlfriend. The victim later verified that the cell phone given to Officer Greer was his.

Officer Greer informed Detective Green that he had obtained the [Petitioner's] cell phone number, and Detective Green called the number. The [Petitioner] answered, but he identified himself as "Dustin Hampton." The [Petitioner], as Dustin Hampton, told Detective Green that the [Petitioner] had not robbed anyone and did not own a hammer. He claimed that the victim was lying about the robbery and that the incident was a result of a sexual assault against his girlfriend.

The [Petitioner] was arrested the next day, and Detective Green recognized the [Petitioner's] voice from their phone conversation. The [Petitioner] admitted that he had been the person speaking to Detective

- 3 -

Green and said that he gave a false name because he was afraid of being arrested. After waiving his Miranda rights, the [Petitioner] gave a statement, which set forth several different versions of the incident.

He said that his girlfriend informed him that she was sexually assaulted by several Hispanic males either late Friday evening or early Saturday morning. She informed him about the sexual assault on Saturday, and she also told him that she was pregnant with his child. The next day, the [Petitioner] saw the alleged rapists in the parking lot of the trailer park, and he went to confront them. He recalled that there were two to four Hispanic men in the parking lot.

The [Petitioner] told Detective Green that he did not have a hammer or any other weapons at the time of the confrontation. He approached the man later identified as the victim and hit him in the face, repeatedly asking, "[W]ho raped my woman?" After the [Petitioner] struck the victim, the victim dropped his cell phone, and he and another individual ran away. The [Petitioner] then picked up the cell phone from the ground.

The [Petitioner] told Detective Green that he worked in construction, and he denied owning a hammer. Later in the conversation, he told Detective Green that he built the porch and railing alongside his trailer. He admitted that he used a hammer for the construction, but he said that he did not know where the hammer was and believed that it had disappeared. He suggested that the Hispanic males had stolen his hammer from his trailer and later returned and placed the hammer on the kitchen counter. When asked if he was in possession of any other tools, the [Petitioner] admitted that he had a "red-handled adjustable wrench" in his back pocket when he confronted the men. He claimed that he never removed the wrench from his pocket, and he was not sure how the men would have seen the wrench in his back pocket. He later stated that he could have had a stick in his hand during the confrontation. He said that he did not hit the men with the stick.

In his statement, the [Petitioner] admitted to Detective Green that he did not contact the police about the alleged assault of his girlfriend; however, he said that he encouraged her to file a report. He told Detective Green that his girlfriend had informed him that she was pregnant with his child and that he attacked the males because they had assaulted his girlfriend while she was carrying his child.

- 4 -

Detective Green also spoke with the [Petitioner's] girlfriend and encouraged her to report the crime. He testified that she told him that the men dragged her from her car into the trailer. She clarified that she was not physically dragged but that the men opened her car door and kept telling her to come inside their trailer. Feeling uneasy, she permitted the men to lead her into the trailer, and she drank a beer with them. She did not remember finishing the beer, as she lost consciousness. When she awoke on Saturday, she did not recall anything that happened after she started to drink a beer. She noticed that her dress was torn on the side, and she felt pain in her rectal region. She told Detective Green that she was not sure if she was assaulted by any of the men. Detective Green did not believe that her statement corroborated the claims of the [Petitioner] because he spoke with her after speaking with the [Petitioner] and because she never filed an official police report.

The [Petitioner's] girlfriend testified that she went to the trailer park on the weekend of the incident to visit friends who lived across from the [Petitioner]. She was talking to Carlos, a friend who lived in the victim's trailer, and he and several others persuaded her to come into their trailer. They offered her a beer, and she started to drink it. She did not remember what happened "after drinking a beer or two." When she awoke the next morning, her clothes were off, and she believed that she had been raped. That evening, she told the [Petitioner] about the incident. The [Petitioner] was "a really good friend" who was upset that she was attacked. The [Petitioner] urged her to report the rape to police. She explained that she did not report the allegation because she had been the victim of a sexual assault when she was younger and did not want to be subjected to another rape trial.

The [Petitioner] stayed Saturday night with his girlfriend. She dropped him off at his trailer around 6:30 a.m. Sunday morning, and they made plans to go to Nashville later in the day. She returned to the trailer park around 12:15 or 12:30 p.m. to pick the [Petitioner] up, and she parked next to his trailer. The [Petitioner] exited the trailer to take the trash out, and his girlfriend saw him start to walk across the road to the trailer where her alleged rapists resided. She became "worried" and "scared" because she "didn't want any problems."

She drove to the end of the trailer park to wait for the [Petitioner] to return. She saw two Hispanic males standing outside of Lot 21. She recognized one of the men as Carlos, and she recognized the other man but

could not recall his name. She testified that the second man was not the victim. She did not recall the [Petitioner's] having a hammer in his hands when he walked toward Lot 21. Several minutes later, the [Petitioner] returned and got into her vehicle.

The [Petitioner's] girlfriend testified on cross-examination that she "wasn't in the situation to actually see that anything occurred" between the [Petitioner] and the males on Lot 21. She agreed that she could not testify with certainty whether the victim was present at the scene of the confrontation, but after seeing the victim in court, she did "not recall him being there" at the scene. She agreed that after his arrest, the [Petitioner] continued to press her to file a police report regarding the sexual assault. She felt somewhat threatened by the situation, and she was particularly unnerved by a comment from the [Petitioner's] family members that her house would be burned down if she did not file a report. She agreed that she was asked to provide the [Petitioner] with an alibi.

The [Petitioner's] second girlfriend testified that she was living with the [Petitioner] in the trailer on Lot 26. She stated that the [Petitioner] had borrowed a hammer from his sister the evening before the incident to repair part of the floor. She testified that the [Petitioner] exited the trailer to take the trash out and that he did not have anything in his hand. He returned to the trailer several minutes later, told her that he was leaving, and he exited the trailer. A short time later, officers arrived at the trailer.

At the conclusion of the proof, the jury convicted the [Petitioner] of aggravated robbery as charged. The trial court denied his motion for new trial, and he timely filed a notice of appeal.

*Crites*, 2015 WL 3508042, at *1-5. On appeal, this court affirmed the Petitioner's conviction and sentence.

## B. Post-Conviction

On July 1, 2016, the Petitioner filed a timely *pro se* petition for post-conviction relief. The post-conviction court appointed him counsel, who filed an amended petition. As relevant to this appeal, the petition alleged that his trial counsel ("Counsel") was ineffective because Counsel did not object to the admissibility of several pieces of evidence: Detective Green's hearsay testimony; Officer Grandy's hearsay testimony; the chain of custody of the hammer; the hammer itself. The post-conviction court held a

hearing on the petition, during which the parties presented the following evidence:[1] Counsel testified that she was appointed to represent the Petitioner on multiple cases. She recalled that she filed a motion to have the Petitioner psychologically evaluated. Counsel also recalled that, while these cases were pending, her investigator learned that the victim had been deported. Counsel therefore filed a motion to dismiss based on the victim's unavailability for trial. Counsel testified that she secured the funds for the investigator, who found a witness to testify on the Petitioner's behalf at trial that she had been raped by the victim.

Specifically about the hearsay allegations, after having her memory refreshed, Counsel recalled Detective Green's testimony about what Sergeant Hoffman had told him about the robbery. She said that even if Detective Green's statement was hearsay, its admission made no difference because it was a "very brief summary" of what Sergeant Hoffman found during the investigation. She said that Sergeant Hoffman or other officers could have testified to the same thing. Counsel said she did not object because the statement was of little consequence, and she did not want to call the jury's attention to the matter.

Counsel also recalled Detective Green testifying about the victim's statement to the police. Counsel agreed that this was hearsay, but she said that she did not think she should have objected because it would draw the jury's attention to the testimony. Counsel said she did not want to make this testimony more obvious. She further stated that she knew that she had multiple other witnesses to refute the victim's statement, so she did not think the objection was well-advised. Counsel did agree that, because the victim testified consistently with his statement to police at trial, Detective Green's recount of the victim's statement could have aided the State.

Counsel said she recalled Officer Grandy testifying about the chain of custody. The officer testified about an evidence log, which was based upon someone writing down whether evidence had been tampered with, checked in, and checked out. Counsel was asked whether she could have made a hearsay objection to the evidence log. She responded that the hammer was found in the house, which corroborated the victim's version of events. She further opined that the evidence log was a business record and that there was no need to object. Had she objected, the State would simply have been required to get the custodian of records to testify to the evidence log; therefore the evidence would still have been admitted.

---

[1] We will attempt to limit our review of the evidence presented at the post-conviction hearing to the evidence relevant to this appeal.

Counsel said she did not object to the hammer's admission into evidence. She said that law enforcement officers found the hammer on the counter, and the defense witnesses were going to testify that the hammer was found on the counter. The picture of the hammer on the counter matched the hammer presented by the State, and Officer Grandy's testimony supported the anticipated testimony from the defense witnesses.

Counsel further explained her decision to not object to the hammer's admission. She said that, had she objected, and the hammer been excluded, the witnesses would have testified that the Petitioner attacked the victim with the hammer, and, in the absence of the hammer being on the counter, the hammer would have appeared "missing." Instead, she chose to allow the admission of the hammer, and the defense witnesses testified and explained that the Petitioner had the hammer because he was fixing a drawer. This corroborated her theory of defense that the Petitioner used the hammer to fix a drawer and not in an attack of the victim, in part because he left it on the counter and did not take it with him.

Counsel recalled that the Petitioner's behavior during the trial was extremely disruptive. He complained that someone stole his shoes that morning and refused to wear shoes to court, and his behavior escalated from there. The judge stopped the trial multiple times to bring the Petitioner into chambers and speak with him. Ultimately, the judge ordered that the Petitioner wear a "shock thing" underneath his clothing. She recalled that the Petitioner's behavior caused her difficulty with hearing what was happening during the trial and focus on the events of the trial. She described the Petitioner as "a very difficult client."

During cross-examination, Counsel testified that, when she began representing the Petitioner he had several recent convictions and several cases that were pending and set for trial after this trial. She said that, once she had been appointed, she reviewed the discovery and filed a motion for funds to hire a private investigator. She then secured additional funds to locate and interview witnesses. Counsel discussed several details of her representation of the Petitioner, including motions that she filed and/or defended and steps that she took to ensure that beneficial witnesses would testify.

Counsel explained that she sometimes would not object to technically inadmissible evidence if she did not want to draw attention to the evidence or if she did not think it would be beneficial. She agreed that juries sometimes felt as if a party was attempting to hide something if there were too many objections. As such, she may not have objected to a hearsay statement if it was going to come in through the next State witness.

Counsel testified that Detective Green's testimony about the victim's statement gave context to the next steps in the detective's investigation. As they "set the scene" for the investigation, Counsel did not think that objecting would be beneficial to her client.

About the evidence log, Counsel said that the discovery included photographs of the hammer on the counter in the trailer. She said that her defense theory included that the Petitioner could not have used the hammer because it was not near the scene but in the trailer. She therefore had no reason to object to the hammer's admission into evidence. Counsel further stated that she had no reason to believe that the hammer had been tampered with in any way.

Counsel offered her belief that none of the issues raised in the Petitioner's post-conviction petition would have altered the outcome of the trial. She reiterated that the Petitioner was difficult during the trial. Counsel said that she represented the Petitioner on appeal, and that the Court of Criminal Appeals affirmed his convictions.

During redirect examination, Counsel clarified that Detective Green's testimony was that, when he arrived at the scene, someone had said that there had been an armed robbery. Detective Green did not identify the speaker. Counsel said she had a plan and a trial strategy and she stuck to that because she anticipated the officer's testimony would be consistent with his report.

Based upon this evidence, the post-conviction court denied the Petitioner's petition. The Petitioner filed an untimely appeal, and this court granted him permission to file a delayed notice of appeal. This appeal ensued.

## II. Analysis

On appeal, the Petitioner argues that Counsel was ineffective for failing to object to the admission of inadmissible evidence, namely Detective Green's testimony about hearsay from the victim and from another officer, the evidence log with regard to the hammer, and the hammer itself. The State responds that Counsel's failure to object was based upon her trial strategy and reasonable tactical decisions and was, therefore, not ineffective. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the

"distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner asserts that Counsel was ineffective when she failed to object to hearsay, the evidence log, and the admission of the hammer. Counsel clearly and articulately explained her trial strategy as relevant to each of the complaints made by the Petitioner. She said that she did not object during Detective Green's testimony because the evidence was going to come in later through different witnesses, and she did not want to call attention to the testimony. She did not think that so doing would benefit her client. About the evidence log and the hammer, Counsel testified that this evidence comported with her theory of the case that, because the hammer was in the trailer on the counter, it could not have been used in the commission of the robbery. She did not object because the defense's own witnesses were going to testify that the hammer was on the counter. This court will not second-guess Counsel's tactical and strategic choices unless those choices were uninformed because of inadequate preparation, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result.

- 11 -

*Williams*, 599 S.W.2d at 280.  We conclude the Petitioner has failed to show that Counsel was deficient in her decision-making process or that Counsel's strategy prejudiced him.

Accordingly, the Petitioner has failed to carry his burden of proof with regard to his allegations of Counsel's deficiencies.  As such, he is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE